

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-23-00303-CR |
| Appellant, | § | Appeal from the |
| v. | § | 229th Judicial District Court |
| REYNALDO ALBERTO PENA | § | of Duval County, Texas |
| | § | (TC# 20-CRD-45) |
| Appellee. | § | |

**SUBSTITUTED MEMORANDUM OPINION[1]**

Appellee Reynaldo Alberto Pena was indicted on one count of aggravated sexual assault of a child under the age of six. Prior to his indictment, Pena voluntarily submitted to a polygraph examination and a post-polygraph interview, which were recorded in a single session. Pena moved to suppress the entire recording as well as any evidence of the inculpatory statements he made during the post-polygraph interview, claiming they were involuntarily made due to the allegedly coercive tactics the polygraph agent used before and during the post-polygraph interview, which included the agent's alleged promises or "reassurances" that Pena would be treated more

---

[1] The Appellee's Motion for En Banc Reconsideration is denied. The September 27, 2024 opinion has been withdrawn, and this opinion is substituted in its place.

"leniently" if he confessed to the assault. In addition, Pena argued that because evidence of the examination itself would not be admissible at trial, the admission of his statements during the post-polygraph examination would violate his Sixth Amendment right to confront witnesses, as he would be unable to fully cross-examine the polygraph agent regarding the context in which the statements were made. The trial court granted the motion and suppressed the entire recording without stating its reasons. This appeal followed.[2]

For the reasons below, we affirm the trial court's decision insofar as it suppresses evidence of the polygraph examination and its results, but we reverse to the extent it suppresses the post-polygraph interview and the inculpatory statements Pena made during the interview.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  The polygraph examination

The child-victim reported to her mother that Pena, who at the time was married to the mother's aunt, had licked her vagina while he was babysitting the child and her siblings. Pena thereafter voluntarily agreed to submit to a polygraph examination at the Jim Hogg County Sheriff's Office. Pena arrived at the office of his own accord and met with a Texas Department of Public Safety (DPS) special agent, Leo Perez.

Prior to the examination, Agent Perez read Pena his *Miranda* rights, and Pena stated that he understood his rights. He signed a "waiver of rights" affirming that he was "knowingly, intelligently, and voluntarily" waiving his *Miranda* rights as listed on the document. Pena also signed a document that indicated he voluntarily agreed to the polygraph examination.

---

[2] This case was transferred from the Fourth Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* Tex. Gov't Code Ann. § 73.001. We decide the case in accordance with the precedent of the transferor court to the extent it conflicts with our own. Tex. R. App. P. 41.3.

The examination lasted approximately two hours and 42 minutes. During the examination, Agent Perez asked Pena several baseline questions as well as two questions related to the offense: (1) whether he had sexual contact with a minor; and (2) whether he licked a child's vagina. Agent Perez repeated the examination five times, asking the same or similar baseline questions each time. Each time, Pena denied he had engaged in any such conduct.

## B. The post-polygraph interview

Following the examination, Agent Perez took a break of approximately 20 minutes. After the break, Agent Perez indicated that he had reviewed the "data" and asked Pena if he was a "predator" or a "monster" from whom we must "protect" our children.

Pena responded in the negative and said he had never been in trouble before. Agent Perez informed Pena that during the examination, the question of whether he had licked a child's vagina "affected" him the most. Agent Perez told Pena that this was "the one" thing he needed to "explain" so that people would not think he was "that type of person," i.e., a "predator." But Pena continued to deny having engaged in any such conduct.

Thereafter, Agent Perez made no further reference to the polygraph examination. Instead, he focused on the child-victim's allegation that Pena had licked her vagina while they were in the bedroom. Agent Perez pointed out that the child-victim indicated that Pena stopped when she asked him to, which the agent opined made her statement both "good and bad," as it demonstrated he did not "force" himself on her in other ways and showed that he had "compassion." Agent Perez repeatedly told Pena he did not believe Pena was a predator, but rather a "good guy" who made a "mistake" and stopped when he realized it was wrong.[3]

---

[3] Agent Perez also told Pena he believed the child's mother was to blame for not taking care of her daughters and for "forcing" him to watch them. He further blamed the mother's aunt (Pena's now ex-wife) for leaving him alone with the children, assuring Pena that he was only "human," that "curiosity got the best of [him]," and that he got "lost in the heat of the moment."

Agent Perez then encouraged Pena to acknowledge his "mistake," suggesting that if he did, the "decision-makers" would view him as "sincere" and as a "human being" who simply made a mistake as we all do, rather than a "monster." At one point, Agent Perez suggested that a person who took responsibility for his actions could possibly receive "probation."

Agent Perez told Pena he believed the situation could have been much "worse," detailing cases in which individuals had committed much more serious sex offenses.

He stated that Pena's case was not like those, as the allegation in his case was a "simple lick" and "nothing serious." However, Agent Perez repeatedly told Pena that he needed to explain his conduct, take responsibility for it, and apologize to the child, or else he would "look bad" and would risk being viewed as "the type we need to put away" or "lock[ ] up."

## C. The confession

After repeatedly being encouraged to apologize, Pena said he was "sorry." When Agent Perez asked why, Pena stated that "nothing happened." However, when Agent Perez insisted that he "knew" something happened because the child's sisters had seen him go into the bedroom with her, Pena responded, "I just licked . . . that's it." Then, Pena explained that the child had walked into the room by herself, laid down on the bed, lifted up her dress, pulled down her panties, and asked him to lick her. Pena stated that he pulled her panties up and pulled them to the side, then licked the child in the middle of her vagina, but stopped when she asked him to. At Agent Perez's request, Pena marked the area where he had licked the child on a plastic replica, and he signed and dated it July 25, 2019. When asked why he licked her, Pena asserted that the child was "teasing" him, but he realized he "screwed up." When Agent Perez asked why he did not tell him about the incident sooner, Pena explained he was "embarrassed" and thought that what he had done was "worse."

4

Agent Perez then called an investigator into the room, and Pena repeated the same sequence of events to him, indicating that he licked her once but did "nothing else." The investigator placed Pena under arrest. Pena was indicted on one count of aggravated sexual assault based on the allegation that he penetrated the child's vagina with his mouth.

### D. Pena's motion to suppress

Pena filed what he labeled as: "Defendant's Motion to Suppress Electronic Recording, Both Video and Audio, of Polygraph Examination of the Defendant." In his motion and supplemental briefing, he sought to suppress the entire recording, to include the approximately two-hour-42-minute polygraph examination as well as the one-hour-ten-minute post-polygraph interview. Alternatively, he sought to suppress "any statement made by the Defendant that the State asserts is an inculpatory admission of any wrongdoing."

Pena's argument was two-fold. First, he argued his confession was "coerc[ed] and involuntary," asserting Perez used "coercive insistence and seductive assurance" during and after the polygraph examination to obtain his confession, in part by suggesting that he might receive probation if he were to confess. According to Pena, during the interview, Agent Perez also engaged in "badgering and cajoling." Pena asserted the agent's "argumentative and accusatory conduct, prolonged and aggressively repetitive for over three hours, was so egregious that any statement obtained thereby was unlikely to have been the product of essentially free and unconstrained choice by the Defendant."

Second, he argued that because his confession came on the heels of the polygraph examination, and because evidence of a polygraph examination is inadmissible at trial, his Sixth Amendment right to cross-examine Agent Perez about the context in which his confession arose would be violated if his inculpatory statements were admitted at trial.

The State, in turn, acknowledged that evidence of a polygraph examination is not admissible at trial and assured the court it had "no intention of offering any statements or questions that arose during the polygraph portion of the defendant's interview nor make any reference to the polygraph examination." However, the State asserted it was entitled to offer Pena's statements during the post-polygraph portion of his interview, subject to redacting any reference to the polygraph examination itself or the results thereof. The State also maintained that Agent Perez did not engage in any coercive tactics or make Pena any improper promises.

**E.  The hearing**

At the hearing on the motion, Agent Perez testified that Pena voluntarily appeared for the polygraph and waived his *Miranda* rights both orally and in writing. Agent Perez testified that Pena never asked to terminate the interview and did not ask for an attorney.

Agent Perez explained that following a polygraph examination, he typically tells an examinee what questions "affected" him or what caused him to "not pass the test." He then asks the examinee to explain why a particular question may have affected him and typically continues to ask the examinee for an explanation until the examinee wants to leave or requests an attorney.

During the post-polygraph phase of his interview with Pena, Agent Perez explained, he was trying to get him to "be honest and tell the truth," in part by trying to get him "to minimize his [conduct] so he [could] overcome the fear and embarrassment of admitting to his . . . actions." According to Agent Perez, he did not make any promise that Pena would get probation or any other favorable treatment if he confessed; he was just "throw[ing] options out there that are available for everybody" and letting Pena know "some possibilities" if he did or did not confess.

6

**F. The trial court's order**

The trial court granted Pena's motion to suppress. In its amended "Order Granting Defendant's Motion To Suppress Electronic Recording, Both Video And Audio, Of Polygraph Examination Of The Defendant," the trial court ruled:

> After having heard from both parties and considered this Motion and submitted Briefs, the Court Grants the Motion to Suppress and rules inadmissible at trial the entire above-described audio and video recording of the polygraph examination, including but not limited to any excerpts that the State asserts are an inculpatory admission of wrongdoing. This includes any evidence deriving from the polygraph examination episode. It includes testimony from Special Agent Perez or any other witness regarding any portion of the polygraph examination or any evidence deriving from the polygraph examination.

The State appealed.[4]

## II. PARTIES' ARGUMENTS

The State first notes that the trial court did not provide the basis for its ruling and assumes the trial court's decision was based on Pena's argument that his confession resulted from Agent Perez's improper promise of a benefit, i.e., that he could receive probation if he confessed. And the State argues the record does not support a conclusion that Agent Perez made an improper promise that would render Pena's inculpatory statements involuntary.

Pena counters that the trial court could have reasonably concluded that his confession was coerced and involuntary, applying a "totality of the circumstances" test, primarily due to Agent Perez's "[r]epeated reassurances—including, but not limited to, the possibility of probation" if he confessed with the intent to "gain an inculpatory statement from [him]." In addition, Pena contends Agent Perez influenced him to incriminate himself using "hope" and "fear"; Pena posits that the agent's "insistence" that he was guilty caused him to fear imminent arrest, and the agent's

---

[4] The State asserts that it requested findings of fact and conclusions of law, which the trial court failed to issue. But its request is not in the clerk's record. No findings of fact or conclusions of law appear in the record.

"seductive assurances" provided "false hope" that he could be treated more leniently if he confessed.

Pena further points out that he raised a second issue in the trial court, which the State did not address in its appellate briefing, regarding whether his Sixth Amendment rights would be violated by admitting his inculpatory statements due to his inability to fully cross-examine Agent Perez regarding the context in which the statements were made, given the inadmissibility of evidence relating to polygraph examinations. And Pena contends this could have properly formed the basis for the trial court's decision to grant his motion to suppress.

## III. INADMISSIBILITY OF POLYGRAPH EXAMINATIONS AND RESULTS

As a preliminary matter, the parties appear to agree that the portion of the recording in which the polygraph examination was conducted, as well any portion of the recording in which either Agent Perez or Pena referred to the examination or its results, would not be admissible in evidence. We agree.

The Court of Criminal Appeals has repeatedly recognized that due to the inherent unreliability of polygraph examinations, any evidence of the existence and results of a polygraph examination is inadmissible over proper objection. *See Leonard v. State*, 385 S.W.3d 570, 577 (Tex. Crim. App. 2012); *see also Ross v. State*, 133 S.W.3d 618, 625 (Tex. Crim. App. 2004) (reaffirming the court's prior holdings that "polygraph evidence is inadmissible for all purposes"). We therefore agree with the trial court's decision to suppress the portion of the recording in which the examination itself is being conducted—ending at two hours and 42 minutes.

In addition, we recognize that during the initial portion of the post-polygraph interview, beginning at three hours and two minutes into the recording, Agent Perez informed Pena that he had been "affected" by certain questions during the examination then asked Pena to "explain" his

reaction to those questions. Accordingly, we conclude that this portion of the recording, and any other portion of the recording in which the polygraph examination is either directly or indirectly mentioned, is also inadmissible. We therefore affirm the trial court's judgment insofar as it suppresses these inadmissible portions of the recording.

We next address the State's argument that the trial court acted improperly when it suppressed the remaining portion of the recording, as well as any evidence pertaining to the inculpatory statements Pena made during the interview.

## IV.    STANDARD OF REVIEW

We review a trial court's suppression ruling under a bifurcated standard of review. *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019). When there are findings of fact, we afford them "almost total deference if they are reasonably supported by the record." *Id.* But when, as here, there are no factual findings, "we assume that the court made implicit findings that support its ruling, provided that those implied findings are supported by the record." *Ex Parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). Although we defer to the trial court's express or implied factual findings, we review questions of law and the application of the law to the facts de novo. *Sims*, 569 S.W.3d at 640.

## V.    PENA'S SIXTH AMENDMENT ARGUMENT

We first examine whether the trial court could have properly based its decision to suppress the post-polygraph interview portion of the recording, as well as the inculpatory statements Pena made during the interview, based on Pena's argument that their admission would violate his Sixth Amendment right to confront witnesses. We conclude, as a matter of law, that Pena's Sixth Amendment rights would not be violated under these circumstances.

**A. Applicable law**

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." *Woodall v. State*, 336 S.W.3d 634, 641 (Tex. Crim. App. 2011) (citing U.S. Const. amend. VI). "This constitutional guarantee applies to both federal and state criminal prosecutions." *Id.* (citing U.S. Const. amend. XIV; *Pointer v. Texas*, 380 U.S. 400, 406 (1965)). "The purpose of cross-examination is to discredit a witness before the fact-finder in any of several ways, as by bringing out contradictions and improbabilities in earlier testimony, by suggesting doubts to the witness, and by trapping the witness into admissions that weaken the testimony." *Coronado v. State*, 351 S.W.3d 315, 326 (Tex. Crim. App. 2011) (quoting Black's Law Dictionary 433 (9th ed. 2009)). Thus, "[t]he cross-examiner may discredit the witness's direct testimony in several different ways, depending upon the witness, the questioner, and the specific situation as it unfolds in the hearing." *Id.*

However, the right is not unlimited, and it does not include "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Irby v. State*, 327 S.W.3d 138, 145 (Tex. Crim. App. 2010); s*ee also Woodall*, 336 S.W.3d at 643 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985) (per curiam)). Thus, a trial court may impose restrictions on cross-examination based on such criteria as "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Johnson v. State*, 490 S.W.3d 895, 910 (Tex. Crim. App. 2016) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

**B. Analysis**

Pena contends that because his confession came during his post-polygraph interview, his Sixth Amendment right to confront witnesses would be violated if his attorney could not cross-examine Agent Perez regarding the "context" in which his confession arose. In particular, Pena maintains that to protect his rights, his attorney should be able to question Agent Perez about his polygraph techniques to ensure they were proper and about the "validity of polygraph science, at least as to its propensity to produce false confessions." But, Pena posits, because evidence of polygraph examinations is inadmissible, he would be barred from doing so. Pena refers to this as an "evidentiary conundrum" Agent Perez created by not conducting the polygraph examination separately from the post-polygraph interview. We find no "evidentiary conundrum" or Sixth Amendment violation in admitting Pena's post-polygraph confession under these circumstances.

Although evidence of a polygraph examination and its results are not admissible at trial, the use of polygraphs as a means of interrogation does not violate an accused's constitutional rights or render a subsequent confession inadmissible. *See Hazlett v. State*, No. 05-16-00495-CR, 2018 WL 1373949, at *2 (Tex. App.—Dallas Mar. 19, 2018, pet. ref'd) (mem. op., not designated for publication). To the contrary, confessions made during a post-polygraph interview are not deemed inadmissible simply because the examination itself would not be admissible. *McCorkle v. State*, No. 14-22-00512-CR, 2023 WL 6561068, at *3 (Tex. App.—Houston [14th Dist.] Oct. 10, 2023, no pet.) (mem. op., not designated for publication) ("Appellant has not provided any authority on point, nor after reasonable research have we found any, to support[] his contention that the inadmissibility of the polygraph test taints, or implicates the inadmissibility of, his confession given after the exam.") (citing *Collins v. State*, 352 S.W.2d 841, 845 (Tex. Crim. App. 1961) ("The

fact that appellant was given a lie detector test prior to making the confession did not render the same inadmissible.")).

Pena appears to acknowledge other courts' holdings that when a defendant has made a confession on the heels of polygraph examination, the proper course of action is—when possible—to redact any reference to the polygraph examination or its results when admitting evidence of the confession. *See Holt v. State*, No. 05-14-00914-CR, 2016 WL 3018793, at *22 (Tex. App.—Dallas May 18, 2016, pet. ref'd) (mem. op., not designated for publication).

Here, we find no impediment to redacting evidence of the polygraph examination and its results from Pena's post-polygraph confession. As set forth above, during the post-polygraph interview, Agent Perez initially made a series of references to the polygraph examination and its results, informing Pena that he appeared to be "affected" by one of the questions he asked during the examination. However, Agent Perez's later questioning centered solely on the child-victim's statement and his urging Pena to apologize to the child and take responsibility for his conduct. By our estimation, Pena's first inculpatory statement was not made until over 20 minutes after Agent Perez's last reference to the polygraph examination, thereby allowing a redacted portion of the recording to be played for the jury without the jury hearing any evidence of the examination. We encourage the parties to thoroughly review the recording to ensure that no such reference is contained in any redacted version of the recording that may be played for the jury.

We further conclude that admitting a redacted portion of the recording without reference to the polygraph examination or its results would not violate Pena's Sixth Amendment rights. Although Pena believes he has a Sixth Amendment right to question Agent Perez regarding the methods he used to conduct the examination, we see no relevance to such a line of questioning under these circumstances. Pena's inculpatory statements not only came well after Agent Perez's

last reference to the polygraph examination, but more importantly, they did not arise, either directly or indirectly, from any questions Agent Perez asked him about the examination. Instead, Pena made his inculpatory statements in direct response to Agent Perez's statement that he "knew" Pena committed the offense based on the child-victim's statements, rather than on any knowledge he obtained from the polygraph examination.

Accordingly, we cannot say that Pena's Sixth Amendment rights would be violated by his inability to question Agent Perez about his polygraph examination methods. *See Foster v. State*, 180 S.W.3d 248, 251 (Tex. App.—Fort Worth 2005, pet. ref'd) (mem. op.) (concluding that defendant's Sixth Amendment rights were not violated where the question he sought to ask the witness was not only irrelevant but likely to cause confusion of the issues). We therefore conclude that the trial court could not have properly granted Pena's motion to suppress based on his Sixth Amendment argument.

## VI. WHETHER PENA'S CONFESSION WAS INVOLUNTARY

We next consider whether the trial court could have properly granted Pena's motion to suppress based on the argument he made in the trial court that his confession was involuntary as the result of Agent Perez's use of allegedly coercive techniques, including his repeated assurances that he would be treated more leniently if he confessed. We conclude that there is no basis in the record for finding that Pena's confession was involuntary.

### A. Applicable law

Article 38.21 of the Code of Criminal Procedure provides that an accused's statement "may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." Tex. Code Crim. Proc. Ann. art. 38.21. To meet constitutional standards, a confession must be both voluntary and taken in

13

compliance with *Miranda.*[5] *Moss v. State*, 75 S.W.3d 132, 139 (Tex. App.—San Antonio 2002, pet ref'd). In assessing the voluntariness of a statement, we consider the totality of the circumstances under which the statement was made, and ultimately whether the appellant's will was overborne. *See Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997) (en banc). "A statement is not voluntary if there was 'official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker.'" *Moss*, 75 S.W.3d at 139 (quoting *Matter of V.M.D.*, 974 S.W.2d 332, 346 (Tex. App.—San Antonio 1998, pet. denied)).

### B. Analysis

#### (1) No promises of leniency

As set forth above, in the trial court, Pena's motion to suppress focused almost exclusively on his claim that his confession was coerced because Agent Perez made "repeated assurances" that he would receive more lenient treatment, including the possibility of probation, if he confessed. On appeal, the State contends that to the extent Pena's argument hinged on a claim that Agent Perez made an improper promise of leniency that rendered his confession involuntary, the trial court could not have used this as a basis for its decision to grant Pena's motion. We agree.

For a promise to render a confession involuntary, the Court of Criminal Appeals has adopted a three part-test, requiring evidence that (1) the promise was "positive"; (2) it was "made or sanctioned by someone in authority"; and (3) it was "of such an influential nature that it would cause a defendant to speak untruthfully." *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App.

---

[5] Although Pena points out that Agent Perez only read him his *Miranda* rights before the polygraph examination and did not read them again before beginning his post-polygraph interview, he does not argue on appeal that his confession was given in violation of *Miranda.* Instead, he correctly points out that being properly Mirandized does not resolve the question of whether his confession was voluntarily made.

2004); *Lopez v. State*, 610 S.W.3d 487, 498 (Tex. Crim. App. 2020) (recognizing same). As the San Antonio Court of Appeals has explained, "[t]o determine whether a promise is likely to influence the defendant to speak untruthfully, we look to whether the circumstances of the promise made the defendant inclined to admit a crime she had not committed." *Cameron v. State*, 630 S.W.3d 579, 593 n.3 (Tex. App.—San Antonio 2021, no pet.) (citing *Harty v. State*, 229 S.W.3d 849, 856 (Tex. App.—Texarkana 2007, pet. ref'd)). The "promise at issue must be of an exceptional character before it will invalidate an otherwise voluntary confession." *Id.* (citing *Espinosa v. State*, 899 S.W.2d 359, 364 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd); *Guerrero v. State*, No. 04-08-00249-CR, 2009 WL 2525434, at *8 (Tex. App.—San Antonio Aug. 19, 2009, pet. ref'd) (mem. op., not designated for publication)).

Applying the three-part test for determining whether an interviewer made an improper promise of leniency, we conclude, as a matter of law, that Pena did not establish his confession was involuntary. First, the record reflects that Agent Perez did not hold himself out as a person who was "in authority" or in a position to make a promise of a benefit. To the contrary, throughout the interview, Agent Perez told Pena that he was not the investigator assigned to his case and that it would be up to the investigator and the other "decision-makers" to determine how his case would be handled.

Moreover, even if we were to assume that Agent Perez was a person "in authority" to make a promise of leniency, we disagree with Pena's argument that Agent Perez made any "positive" statements of such an influential nature so as to cause him to confess to a crime that he did not commit or to speak untruthfully. Pena's argument rests exclusively on a passage in which Agent Perez informed Pena that the investigator assigned to his case would want to know he takes "responsibility for [his] actions," he knows what he did was "wrong," it was "one mistake, one

time," and was "not [going] to happen again" and did not "happen again." Agent Perez then stated, it was "one mistake, one time [and] a person like that . . . maybe probation . . . classes, counseling . . . something like that[.]" And he further told Pena that if he were to say he was sorry and apologize to the child and her family, "that's what [the investigator] needs to know, and I think you'll come out pretty good," as the "decisionmakers" will view you as a "human being . . . not a predator."

We do not find that this passage—or any other passage in the recording—constituted an improper promise that would have overborne Pena's will such that it caused him to confess to a crime he did not commit. "A confession is not rendered inadmissible because it is made after an accused has been told by the officer taking the confession that it would be best to tell the truth . . ." or "it would be best for him to go ahead and make a statement," or "it would be better to get his business straight." *Dykes v. State*, 657 S.W.2d 796, 797 (Tex. Crim. App. 1983) (en banc); *see also Johnson v. State*, 68 S.W.3d 644, 654 (Tex. Crim. App. 2002) (providing that officer's representation that an accused's cooperation would be conveyed to the trial court was not a promise inducing a confession); *Drake v. State*, 123 S.W.3d 596, 603 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (concluding that an officer's general, non-specific statement that an appellant "could help herself" if she confessed did not render appellant's statement involuntary). Stated otherwise, such statements suggesting that a person may be treated more favorably if he confessed are not considered to be so influential that they would cause a person's will to be "overborne" to such an extent that he would involuntarily confess to a crime he did not commit. *See Allen v. State*, No. 14-14-00708-CR, 2016 WL 269900, at *3–4 (Tex. App.—Houston [14th Dist.] Jan. 21, 2016, no pet.) (mem. op., not designated for publication) (interviewer's suggestion that he would be treated more favorably if he provided an "explanation" for his conduct and that interviewer would

speak with the "investigators" about his case did not rise to the level of a "promise" that would have rendered the defendant's statements involuntary); *Herrera v. State*, 194 S.W.3d 656, 660 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Agent Perez's statement was simply a statement of fact that a confession can sometimes result in leniency; we do not view it as a promise. *See Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993) (en banc) (noting that interviewer's statement that a confession could result in leniency was a statement of fact and not a promise of leniency in exchange for a confession); *Mason v. State*, 116 S.W.3d 248, 261 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (officer's statements that defendant's situation would "go better" for him if he gave a confession did not amount to a promise).

### (2) Totality of the circumstances test

Aside from the any alleged promise of leniency, Pena also contends we should uphold the trial court's decision to suppress his confession as involuntary under a broader "totality of the circumstances" test. *See Creager*, 952 S.W.2d at 856 (recognizing that when a defendant alleges his confession was coerced by more than an improper promise, a court should apply a "totality of the circumstances" test in determining whether the confession was involuntary). Even applying such a test, however, we conclude that Pena has not pointed to any factors from which the trial court could have concluded his confession was involuntary.

There are a variety of factors that may render a confession involuntary under a totality of the circumstances test, including but not limited to situations in which: the interrogation is unduly lengthy; the defendant has been deprived of sleep, food, water, or the opportunity to take needed breaks; and the interviewer has made threats or engaged in other inappropriate conduct. *See, e.g.*, *Sandoval v. State*, 665 S.W.3d 496, 523 (Tex. Crim. App. 2022), reh'g denied (May 17, 2023), cert.

denied, 144 S. Ct. 1166 (2024) (recognizing among other factors that may render a confession involuntary, "the lack of any advice about constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep"); *Lopez v. State*, 610 S.W.3d 487, 496 (Tex. Crim. App. 2020) (recognizing that "threatening to arrest a close family member . . . depriv[ing] the accused of food and sleep and interrogat[ing]him for hours on end" can be factors a court may consider in determining whether a confession was involuntary under a totality of the circumstance test).

But as the Texas Court of Criminal Appeals has repeatedly recognized, even when such factors are present, the key issue is whether the suspect's "will has been overborne and his capacity for self-determination critically impaired" by police "overreaching." *Sandoval*, 665 S.W.3d at 523; *see also Creager*, 952 S.W.2d at 855 (recognizing that in determining whether a confession was involuntary due to police overreaching, "[t]he ultimate question is whether appellant's will was overborne").

Here, the record does not support such a finding. To the contrary, during the videotaped interview, Pena appears to be calm and cooperative. He never asked to speak to an attorney or terminate the interview; he was not deprived of food, beverage, or the opportunity to take a break if needed. There is nothing in the record to indicate that Agent Perez made any threats to Pena. And as set forth above, the record does not support a finding that Agent Perez made any improper promises of leniency. Moreover, although Perez appears to complain that the entire process of conducting the examination and the interview lasted almost four hours, he does not contend that the length of the interrogation rendered his confession involuntary. Nor do we believe it did, particularly given the fact that Pena appeared willing at all times to continue the interview. *See Smith v. State*, 779 S.W.2d 417, 429 (Tex. Crim. App. 1989) (holding that eight hours of

questioning without food did not render confession involuntary in light of the defendant's willingness to continue with the interview).

Pena nevertheless maintains that the trial court could have found that his will was overborne by Agent Perez's allegedly improper tactic of alternating between filling him with the fear of being arrested and imprisoned—by accusing him of committing the offense—and giving him "false hope" that he would be treated leniently if he confessed. In support of his argument, Pena seeks to analogize his situation to the facts in *Arizona v. Fulminante*, 499 U.S. 279 (1991) in which the United States Supreme Court agreed with a state court's finding that there was sufficient evidence upon which to find that a defendant's confession had been coerced by a law enforcement agent's promise of protection. In that case, the defendant was facing possible charges for raping and murdering his eleven-year-old stepdaughter but was in prison on an unrelated offense. *Fulminante*, 499 U.S. at 282. An undercover law enforcement agent in the prison told him that his fellow inmates were threatening to harm him due to what he had done to his stepdaughter, and he promised to "protect" the defendant if he confessed to the crime. *Id.* at 282–83. The Court found that the defendant's resulting confession was involuntary because the defendant faced a "credible threat of physical violence" if he did not confess, and the agent's promise of protection therefore caused the defendant's "will [to be] overborne in such a way as to render his confession the product of coercion." *Id.* at 287–88.

Pena urges the similarity in his case, arguing it is well-known that Texas prisons are dangerous places for those convicted of sexual crimes against children, and therefore, "even a glimmer of false hope of probation could persuade the accused to incriminate himself to lessen the risk." Unlike the situation in *Fulminante*, however, there is nothing in the record before us to suggest that Pena faced a "credible threat of violence" if he did not confess or that Agent Perez

19

offered to protect him from any such threat. To the contrary, Agent Perez made it clear that he was not able to provide Pena with any direct help and that it would be up to the investigator or other decisionmakers to make the decisions.

Accordingly, we conclude that the trial court could not have properly granted Pena's motion to suppress on the basis that Pena's confession was involuntary for any or all of the reasons discussed above.

## VII. CONCLUSION

The trial court's judgment is affirmed in part and reversed in part. We affirm the trial court's order granting Pena's motion to suppress insofar as it orders the suppression of any evidence relating to the polygraph examination and its results. But we reverse the trial court's order insofar as it (1) suppresses the recorded portion of the post-polygraph interview that contains no reference to the examination or its results and (2) suppresses the inculpatory statements Pena made during that portion of the interview.[6]

LISA J. SOTO, Justice

December 4, 2024

Before Alley, C.J., Palafox, Soto, JJ.

---

[6] This opinion should not be read as prohibiting Pena from challenging the admissibility of the post-polygraph interview or his inculpatory statements on other grounds in the trial court. Our holding only pertains to the two grounds addressed in the opinion.